IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP 28 2009

JAMES N. HATTEN, Clerk
By: [signature]
Deputy Clerk

JEAN HERRICK, MOTHER AND
ADMINISTRATOR OF THE ESTATE OF
ANGELA THOMPSON, DECEASED,

        Plaintiff,

v.

CARROLL COUNTY, GEORGIA; TERRY
E. LANGLEY, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS
SHERIFF OF CARROLL COUNTY;
MAJOR DAVID JORDAN,
INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS JAIL
SUPERVISOR; CORRECTHEALTH
CARROLL, LLC; NURSE JANE DOE,
INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS AN
EMPLOYEE OF CORRECTHEALTH
CARROLL, LLC AND THE CARROLL
COUNTY SHERIFF'S OFFICE; and
DR. JOHN DOE, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS AN
AGENT AND EMPLOYEE OF
CORRECTHEALTH CARROLL, LLC AND
THE CARROLL COUNTY SHERIFF'S
DEPARTMENT,

        Defendants.

CIVIL ACTION NO.

1:09-CV-0161-JEC

### ORDER AND OPINION

This case is presently before the Court on defendant CorrectHealth Carroll LLC's ("CorrectHealth's") First Motion for Summary Judgment [29], plaintiff's Motion to Amend the Complaint

[42], defendant CorrectHealth's Motion for an Extension of Time to Respond to Plaintiff's Response [44], CorrectHealth's Second Motion for Summary Judgment [47], defendant Carroll County's Motion for Summary Judgment [48], and plaintiff's Motion for an Extension of Time to Respond to CorrectHealth's Second Motion for Summary Judgment [52].

The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant CorrectHealth's Motion for an Extension of Time to Respond [44] should be **GRANTED**, plaintiff's Motion for an Extension of Time to Respond [52] should be **GRANTED**, plaintiff's Motion to Amend the Complaint [42] should be **GRANTED**, defendant CorrectHealth's Second Motion for Summary Judgment [47] should be **GRANTED**, CorrectHealth's First Motion for Summary Judgment [29] should be **DENIED as moot**, and Carroll County's Motion for Summary Judgment [48] should be **GRANTED**.

## BACKGROUND

Plaintiff in this action is Jean Herrick, the mother of Angela Thompson and the administratrix of Ms. Thompson's estate. (Compl. [1] at ¶ 1.) Ms. Thompson was diagnosed with renal cell carcinoma while in Carroll County Jail and was released on signature bond. (Herrick Aff. [54] at ¶ 5.) She passed away two months later from

2

complications arising from her condition. (*Id*. at ¶ 7.) Plaintiff subsequently filed this action asserting federal and state claims against defendants for their alleged failure to provide adequate medical care to Ms. Thompson. (Compl. [1].)

## I. Medical Procedures in Carroll County Jail

When inmates desire medical attention in Carroll County Jail, they fill out a "sick call slip" and place the completed slip in a secure box during meals. (Jordan Dep. [64] at 13-14.) One of the sheriff's officers collects the box daily and takes it to "medical." (*Id*.) A staff member of CorrectHealth, the company contracted to provide medical services to inmates, reviews the call slips and makes an individual determination as to each one. (Smith Dep. [53] at 17-18 and Jordan Dep. [64] at 14.) If the inmate's medical needs require attention, the inmate is examined by a CorrectHealth doctor or nurse and treated accordingly. (Smith Dep. [53] at 21-22 and Jordan Dep. [64] at 13.) If treatment outside the jail is warranted, CorrectHealth personnel submit a medical transport request, which the Carroll County Jail grants as a matter of course. (Jordan Dep. [64] at 46-47.) If there is an emergency, the jail officers are directed to call CorrectHealth staff immediately. (*Id*. at 23.)

## II. Ms. Thompson's Incarceration and Medical Care

Ms. Thompson was incarcerated in the Carroll County Jail for

3

forgery on April 11, 2005. (Inmate File, Ex. B to Carroll County's
Mot. for Summ. J. [48] at 21.) When she arrived at the jail,
CorrectHealth staff filled out an "Intake Screening and
Demographics Form" and placed it in her file. (Med. R., Ex. C to
Carroll County's Mot. for Summ. J. [48] at 4-6.) The form
indicates that Ms. Thompson had an ulcer, a history of diabetes,
and a fractured bone in her right foot. (*Id.*) She was also
hypoglycemic. (*Id.*) The form does not note any other health
concerns. (*Id.*)

After a brief release, Ms. Thompson was returned to Carroll
County Jail on August 8, 2005. (Inmate File [48] at 1-3.) Upon
her reentry, CorrectHealth staff performed another medical intake
screening. (*Id.*) The second screening indicated the same medical
problems that existed in April. (Med. R. [48] at 9-10.) No new
problems were noted. (*Id.*)

Between August 8, 2005 and September 30, 2005, Ms. Thompson
requested medical treatment at least twelve times for various
ailments that did not relate to renal cell carcinoma, including a
sinus infection, skin rash, constipation, and an abscess. (*Id.* at
14-25, 27.) She received medical treatment for each complaint,
including creams, laxatives, and prescribed medications. (*Id.* at
48-50 and Second Oladele Dep. [63] at 86-87.)

On August 29, 2005, Ms. Thompson reported that she was passing

4

blood in her urine, but she did not indicate that she was experiencing any pain. (Med. R. [48] at 42.) A urinalysis was performed on the next day, and the results were consistent with a urinary tract infection ("UTI"). (Smith Dep. [53] at 73.) CorrectHealth personnel prescribed double strength bactrim, the regular medication for a UTI, for five days. (Med. R. [48] at 48; and Oladele Dep. [62] at 93.) Ms. Thompson's symptoms resolved. (*Id.*)

Ms. Thompson again complained of blood in her urine on September 26, 2005. (Med. R. [48] at 49 and Smith Dep. [53] at 74.) A urinalysis was performed on the same day. (*Id.*) The results suggested that Ms. Thompson was suffering from another UTI or kidney stones. (Med. R. [48] at 49.) CorrectHealth employee P.A. Rose prescribed antibiotics and a pain reliever, and referred Ms. Thompson to Dr. Walter Smith. (*Id.*) Dr. Smith ordered a renal ultrasound, which was performed three days later. (*Id.* at 51 and Smith Dep. [53] at 29-30.) In the interim, Ms. Thompson was admitted into the jail infirmary, where she remained until the results of her ultrasound were received and interpreted on October 5, 2005. (Med. R. [48] at 51.) She was given Darvocet, a pain medication, every six hours as needed. (Second Oladele Dep. [63] at 93.)

The ultrasound revealed an unidentifiable mass and small

5

densities representative of kidney stones. (Med. R. [48] at 62 and Smith Dep. [53] at 34.) Accordingly, Dr. Smith ordered a CT scan of Ms. Thompson's abdomen and pelvis. (Med. R. [48] at 52 and Smith Dep. [53] at 37-38.) The CT scan was performed at Tanner Medical Center on the next available appointment date of October 20, 2005. (Med. R. [48] at 45-46, 52-54.) CorrectHealth medical staff examined Ms. Thompson many times between the date the scan was ordered and the date it was performed. (*Id.*) During these examinations, the staff prescribed medications for pain and nausea. (*Id.* and Smith Dep. [53] at 86-87.)

### III. Ultimate Diagnosis

The CT scan revealed a 13.3cm x 14.7cm mass on Ms. Thompson's left kidney, which the doctors presumed was renal cell carcinoma. (Certified Copy of Thompson's Med. R. from Tanner Med. Center, Ex. D attached to Carroll County's Mot. for Summ. J. ("Tanner Records") [48] at 18.) The CT scan also revealed metastasis to the right lung in the form of a 1.5cm x .9cm nodule, a separate 7mm soft tissue nodule, and metastasis in the form of a 4.9cm x 4.8cm mass in Ms. Thompson's chest. (*Id.*)

With a diagnosis of inoperable kidney cancer, Ms. Thompson was released from Carroll County Jail on October 20, 2005 on a signature bond. (Inmate File [48] at 6, 20.) Ms. Thompson returned home and was cared for by plaintiff. (Herrick Aff. [54]

6

at ¶¶ 7-9.) Plaintiff states that, during this time, Ms. Thompson told her that the Carroll County Sheriff's Office had refused to believe that she was seriously ill and that they had failed to give her pain medication. (*Id.* at ¶¶ 14-15.) Ms. Thompson died of complications arising from metastatic renal cell carcinoma on December 18, 2005. (Certified Copy of Death Certificate, Ex. E to Carroll County's Mot. for Summ. J. [48].)

Plaintiff subsequently initiated this lawsuit, asserting federal constitutional claims under 42 U.S.C. § 1983, as well as various state law claims. (Compl. [1] at ¶¶ 11-45.) Defendants have filed motions for summary judgment on all of plaintiff's claims. (CorrectHealth Second Mot. for Summ. J. [47] and Carroll County Mot. for Summ. J. [48].) Those motions, and several related motions, are presently before the Court.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,*

7

477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[1] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

---

[1] The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

8

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a *genuine* issue for trial.

## II. **Plaintiff's Federal Claims**

In order to prevail on her federal § 1983 claims, plaintiff must show that defendants: (1) deprived her daughter of a constitutional right, (2) under color of state law. *Edwards v. Wallace Community College,* 49 F.3d 1517, 1522 (11th Cir. 1995)

9

AO 72A
(Rev.8/82)

(citing *Gomez v. Toledo,* 446 U.S. 635 (1980)). Plaintiff must also demonstrate an adequate basis for holding the County or the individual defendants liable for the constitutional violation. *See Griffin v. City of Opa-Locka,* 261 F.3d 1295, 1307 (11th Cir. 2001) (citing *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 663 (1978)). There is no *respondeat superior* liability under § 1983. Plaintiff has not produced sufficient evidence to meet either of these requirements.

**A.   There Is No Evidence of a Constitutional Deprivation.**

1.   Plaintiff's Fourth Amendment Claims

Plaintiff vaguely suggests that defendants violated her daughter's rights under the Fourth Amendment by subjecting Ms. Thompson to "unwarranted intrusion and illegal seizure." (Pl.'s Resp. Br. [56] at 7.)   The Fourth Amendment protects against unreasonable searches and seizures. *See United States v. Segura-Baltazar,* 448 F.3d 1281, 1285 (11th Cir. 2006)("To prevail on a Fourth Amendment claim . . . there must be . . . an invasion of the claimant's reasonable expectation of privacy"). However, plaintiff does not explain how any of defendants' actions regarding her daughter's medical care amounted to or resulted in an unreasonable search and seizure.   Nor does she provide any additional allegations, much less evidence, to support her Fourth Amendment claim. Accordingly, plaintiff cannot establish any constitutional

10

deprivation of Ms. Thompson's Fourth Amendment rights.

    2.    Plaintiff's Eighth and Fourteenth Amendment Claims

Plaintiff's Eighth and Fourteenth Amendment claims are based on defendants' failure to provide adequate medical care to Ms. Thompson while she was incarcerated. In order to show a violation of either constitutional provision, plaintiff must demonstrate that defendants were "deliberately indifferen[t]" to Ms. Thompson's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)(quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). *See also Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)(explaining that deliberate indifference to an inmate's serious medical need can constitute deprivation of due process) and *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007)("the standards under the Fourteenth Amendment are identical to those under the Eighth"). Defendants concede that Ms. Thompson had a serious medical need, but they contend that there is no evidence of "deliberate indifference." The Court agrees.

Allegations of misdiagnosis, accidents, and poor exercise of judgment are insufficient to show deliberate indifference. *Estelle,* 429 U.S. at 106. ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") *See also Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995)(explaining that, under *Estelle*, medical negligence is an

11

inappropriate basis on which to attach § 1983 liability). Medical treatment only violates the Constitution when it is "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)(quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). For example, courts have found deliberate indifference where corrections officials refused to treat a patient or deliberately delayed access to treatment. *See Waldrop v. Evans*, 871 F.2d 1030, 1034-35 (11th Cir. 1989)(doctor's failure to take any action after inmate slashed his forearm after being taken off of his psychiatric medicine could constitute deliberate indifference) and *Lancaster v. Monroe County,* 116 F.3d 1419, 1426-27 (11th Cir. 1997)(jailer could be found deliberately indifferent for delaying treatment when he knew that inmate would have a seizure if no treatment was provided for his severe alcoholism).

There is no evidence to suggest that Ms. Thompson received "grossly inadequate" medical care or that defendants were otherwise "deliberately indifferent" to her medical condition. On the contrary, the record shows that every time Ms. Thompson complained of a health problem, she received prompt attention and treatment. During her second incarceration, beginning in August 2005, Ms. Thompson's records indicate that she requested treatment

12

approximately twenty-three times.[2] (Med. R. [48] at 15-74.) In response to these requests, more than twenty doctors' orders were issued on her behalf, including numerous prescriptions and admissions to the infirmary. (*Id.*) She was prescribed antibiotics, Benadryl, antacids, laxatives, and pain medications. (*Id.*)

Ms. Thompson also received treatment for her more severe symptoms. When Ms. Thompson complained of blood in her urine on August 29, 2005, CorrectHealth staff ordered a urinalysis. (Oladele Dep. [63] at 82.) The results were consistent with a UTI.[3] (*Id.* at 88.) As a result of their findings, CorrectHealth personnel prescribed double strength bactrim, the regular medication for a UTI, for five days. (*Id.* at 93.) The medication appeared to treat Ms. Thompson's symptoms successfully. Although Ms. Thompson made several other medical complaints in the interim, she did not complain of hematuria again until September 24 and 25,

---

[2] Defendants cannot have been deliberately indifferent to a medical condition of which they and Ms. Thompson were unaware. The analysis therefore focuses on the facts from August 29th, the first date that Ms. Thompson presented with any signs of renal cell cercinoma. (*See* Med. R. [48] at 3-4, 9-10 and Smith Dep. [53] at 73.)

[3] The urinalysis revealed the existence of leukocytes (white blood cells), which are consistent with an infection. (Oladele Dep. [63] at 89.) The CorrectHealth personnel also checked to see whether Ms. Thompson was anemic, which could be a sign of something more serious. (*Id.* at 90.) She was not. (*Id.*)

13

AO 72A
(Rev.8/82)

2005. (*See* Med. R. [48] at 19-29.)

When the hematuria returned, and Ms. Thompson also complained of flank pain, CorrectHealth's P.A. Rose started to believe that a kidney stone might be the culprit. (Rose Dep. [53] at 19-20.) He examined Ms. Thompson's abdomen, but noted that there was no mass and no nausea. (*Id.*) He prescribed an antibiotic and a pain medication, ordered another urinalysis, and gave Ms. Thompson a urine strainer in case she passed any stones. (*Id.* at 19-20.) He also referred Ms. Thompson to Dr. Smith, who ordered a renal ultrasound. (Rose Dep. [53] at 23 and Oladele Dep. [63] at 94.) (Oladele Dep. [63] at 95.)

The ultrasound revealed stones and a possible mass, which was ill-defined. (Oladele Dep. [62] at 97-98 and Second Oladele Dep. [63] at 47.) As a result, Dr. Smith ordered a CT scan. (Oladele Dep. [62] at 98.) CorrectHealth personnel made the next available appointment for the scan, which was approximately two weeks after the renal ultrasound results were returned. (*Id.* at 98-100.) Based on the results of the CT scan, defendants reached the proper diagnosis of renal cell carcinoma.

Plaintiff's expert, Dr. Oladele, suggests that CorrectHealth's diagnostic process was inadequate. (Oladele Dep. [62] at 80-81.) Assuming that Dr. Oladele would have pursued a more aggressive diagnostic plan, his testimony does not demonstrate deliberate

14

indifference. *See Blanchard v. White County Det. Ctr. Staff*, 262 Fed. Appx. 959, 964 (11th Cir. 2008) ("When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'") (quoting *Harris*, 941 F.2d at 1504).

In any case, the medical records show that the CorrectHealth staff did almost all of the diagnostics that Dr. Oladele would have advised. For example, Dr. Oladele states that "the diagnostic process" should have begun on August 30th, when Ms. Thompson presented with hematuria and the urinalysis was performed. (Oladele Dep. [63] at 96.) Dr. Oladele states that the response to Ms. Thompson's first claim of hematuria should have included a physical exam, lab tests, and other diagnostic tests in sequence. (*Id.* at 82.) In fact, CorrectHealth staff saw Ms. Thompson on August 30th, did a physical exam, palpated her abdomen on several occasions, performed a urinalysis, and followed up with additional diagnostics, including a renal ultrasound and a CT scan. (*Id.* at 82, 87.)

Dr. Oladele also claims that defendants failed to properly address Ms. Thompson's pain in October, 2005. (Oladele Dep. at 80–81.) However, Ms. Thompson's medical records demonstrate a prompt response to every complaint of pain that she made. On October 1st, when Ms. Thompson was still in the infirmary, she complained of

15

lower abdomen pain rating "ten out of ten" on the pain scale. (Med. R. [48] at 45-46.) She was seen that day and given more pain medication. (*Id.*) On October 7th, Ms. Thompson complained that CorrectHealth staff had stopped giving her pain medication on that day and that she was in pain. (*Id.* at 33-34.) She was given more medication on the next day, October 8th. (*Id.* at 52.) On October 10th, she complained of "bad pain" in her side on a sick call slip. (*Id.* at 53.) She was seen on the same day and given more medication. (*Id.*) The only time Ms. Thompson complained that she ran out of pain medication and went for more than one day without receiving more medication or seeing a doctor occurred on October 15th. (Med. R. [48] at 36-39 and Second Oladele Dep. [63] at 94.) However, she was given more pain medication and readmitted into the infirmary for better management of pain on October 17th. (Med. R. [48] at 36-39.)

Based on this record, no reasonable jury could conclude that Ms. Thompson's care was so inadequate as to manifest the kind of "conscious or callous indifference" necessary to show a constitutional violation. *Harris*, 941 F.2d at 1506. *See also Waldrop*, 871 F.2d at 1035 (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"). There is no indication in the record that Ms. Thompson's care was obstructed, unreasonably delayed, or that

16

medical and jail staff ignored any of Ms. Thompson's complaints. (Second Oladele Dep. [63] at 79.) When "[m]easured against constitutional minima," Ms. Thompson's treatment was adequate as a matter of law. *Harris*, 941 F.2d at 1507. *See Blanchard,* 262 Fed. Appx. at 964 ("Deliberate indifference is not established where an inmate received care but desired different modes of treatment."). Accordingly, the Court **GRANTS** defendants' motions for summary judgment.

### B. There Is No Official or Individual Liability.

In addition, plaintiff cannot establish a basis for holding Carroll County, or any of the individual defendants, liable for Ms. Thompson's allegedly inadequate treatment. Thus, defendants would be entitled to summary judgment even if plaintiff were able to show a constitutional violation.

#### 1. Carroll County

There is no *respondeat superior* liability under § 1983. *Griffin v. City of Opa-Locka,* 261 F.3d 1295, 1307 (11th Cir. 2001) (citing *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 663 (1978)). Thus, a municipality is only liable under § 1983 for constitutional deprivations that are caused by a governmental policy or custom. *Id.* Moreover, "[i]t is not sufficient for a [municipality's] policy to be tangentially related to a constitutional deprivation." *Cuesta v. School Bd. of Miami-Dade*

17

*County,* 285 F.3d 962, 967 (11th Cir. 2002). Instead, "[t]he 'official policy or custom must be the moving force of the constitutional violation in order to establish liability . . . under § 1983.'" *Id.* (citing *Gilmere v. City of Atlanta,* 737 F.2d 894, 901 (11th Cir. 1984)). Accordingly, in order to prevail on her claim against Carroll County, plaintiff must show that a County policy or custom was the "moving force" behind Ms. Thompson's inadequate medical care.

Plaintiff vaguely refers in her Complaint to a "custom, policy, [or] pattern" of failing to train and supervise jail personnel with regard to providing medical treatment. (Compl. [1] at ¶¶ 24-28.) However, she does not describe the offending "custom or policy" in any detail. Neither does she present any evidence to sustain her claim that any such custom or policy exists. On the contrary, the evidence suggests that the policies in place at the Carroll County Jail facilitated the inmates' access to medical care and ensured their safety. The Sheriff required the deputies to (1) deliver the sick call slips to medical, (2) transport inmates to the hospital when CorrectHealth asked as a matter of course, and (3) contact medical staff immediately in the event of an emergency. (Jordan Dep. [64] at 14, 15, 23, 46-47.) In addition, the record shows that CorrectHealth staff (1) was available twenty-four hours a day and seven days a week, (2) treated inmates' non-emergency

18

requests within twenty-four to forty-eight hours, and (3) responded immediately to emergency requests. (Rose Dep. [53] at 9 and Oladele Dep. [63] at 100-01.)

In short, there is no evidence that Carroll County, or any of its employees, invoked a policy to interfere with or delay the medical care provided to inmates. For this additional reason, the County's motion for summary judgment is **GRANTED**.[4]

## 2. Sheriff Langley

Like the County, Sheriff Langley cannot be held personally liable under § 1983 on a theory of *respondeat superior*. *See Adams*, 61 F.3d at 1544 ("Supervisory personnel . . . cannot be held liable under section 1983 for the actions of their subordinates under a theory of *respondeat superior*.")(citing *Monell*, 436 U.S. at 691). Any claims against Sheriff Langley in his individual capacity must arise from his own acts, such as (1) his personal participation in the constitutional violation, or (2) his implementation of a policy that contributed to the violation. *Id.* Applying this standard, the record evidence does not support any claims against Sheriff Langley in his individual capacity.

---

[4] This ruling is equally applicable to plaintiff's claims against the individual defendants in their official capacity. *See Busby,* 931 F.2d at 776 ("when an officer is sued . . . in his or her official capacity, the suit is simply 'another way of pleading an action against' . . . the city that the officer represents.")

AO 72A
(Rev.8/82)

As an initial matter, Sheriff Langley was not personally involved in Ms. Thompson's care. In fact, there is no evidence that Sheriff Langley knew of or had any reason to know of Ms. Thompson while she was incarcerated at Carroll County Jail. The only involvement Sheriff Langley had with Ms. Thompson's medical care was in his oversight of the County's medical services contract with CorrectHealth. However, there is no evidence that Sheriff Langley interfered in any way with CorrectHealth's performance of that contract, or that he failed to ensure its proper implementation.

Neither is there any evidence that Sheriff Langley implemented a policy that contributed to Ms. Thompson's allegedly inadequate care. Plaintiff suggests that Langley failed to properly supervise or train his deputies, or CorrectHealth personnel, in their provision of medical services. (Pl.'s Br. [56] at 12.) A failure to supervise claim may arise where there is "a history of widespread abuse" that "puts the responsible supervisor on notice of the need to correct the alleged [conduct]." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). However, there is no evidence that Sheriff Langley was aware of any previous violations regarding medical treatment, or that he was otherwise aware of a need for additional training or supervision of jail staff or CorrectHealth personnel.

20

Finally, Sheriff Langley is entitled to qualified immunity. Qualified immunity confers complete protection upon government officials sued in their individual capacities unless their conduct "'violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official is entitled to qualified immunity if an objectively reasonable official in the same situation could have believed that his actions were lawful. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638-41 (1987)). Qualified immunity allows government officials to carry out their discretionary duties without fear of personal liability or harassing litigation and protects from suit, "all but the plainly incompetent or one who is knowingly violating the federal law." *Vinyard*, 311 F.3d at 1346 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

To receive qualified immunity, a public official must first demonstrate that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Id.* Once the defendant meets this requirement, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.*

There is no question that Sheriff Langley was acting within

21

his discretionary authority in training and supervising his subordinates at the Carroll County Jail, and in ensuring that the CorrectHealth contract for medical services was properly implemented. *See Andrews v. Monroe County Bd. of Ed.,* 299 Fed. Appx. 937, 940 (11th Cir. 2008)(actions taken "pursuant to the performance of [an official's] duties" and "within the scope of his authority" are within the scope of an official's discretionary authority). Plaintiff thus has the burden of showing that qualified immunity is not appropriate, which she does not even attempt to meet. *Vinyard,* 311 F.3d at 1346. For these additional reasons, Sheriff Langley's motion for summary judgment is **GRANTED**.

### 3. Dr. Smith[5]

Dr. Smith's personal involvement with Ms. Thompson's care was also fairly limited. Dr. Smith's first decision was to order a renal ultrasound on September 29, 2005 based on Ms. Thompson's recurrent UTI and hematuria. (Smith Dep. [53] at 29-31.) Because the ultrasound results were inconclusive and showed a potential mass, Dr. Smith ordered a CT scan of Ms. Thompson's abdomen and

---

[5] Plaintiff filed a motion to amend her complaint to name P.A. Rose and Dr. Smith as the real parties in interest. (Mot. to Am. [42].) Plaintiff claims that the identities of these defendants became clear through discovery. (*Id.* at 1-2.) Pursuant to Federal Rule of Civil Procedure 15(a), the Court **GRANTS** plaintiff's motion. *See* FED. R. CIV. P. 15(a) (leave to amend shall be "freely give[n] . . . when justice so requires").

pelvis. (*Id.* at 35-38.) Dr. Smith scheduled Ms. Thompson for the first available appointment with the off-site CT scan facility, and the test was actually performed on October 20th. (*Id.* at 41-42.) When Dr. Smith received the CT scan results, he accurately diagnosed Ms. Thompson with renal cell carcinoma, and recommended that she be referred to a hematologist/oncologist. (*Id.* at 48-49.) However, Ms. Thompson was then released from jail. (*Id.* at 48-49.)

As with Sheriff Langley, there is no evidence that any of Dr. Smith's personal actions negatively affected Ms. Thompson's treatment or care. Indeed, plaintiff's expert Dr. Oladele does not challenge the efficacy of Dr. Smith's decisions. (Oladele Dep. [63] at 25-28.) Although Dr. Oladele indicated that the CT scan should have been performed sooner, the short delay here does not amount to deliberate indifference. *See Harris*, 941 F.2d at 1505 (noting that a mere difference in medical opinion or even evidence of malpractice will not support constitutional liability).

With regard to supervisory liability, there is no evidence that Dr. Smith failed to supervise his CorrectHealth subordinates or that such failure caused a constitutional violation. There is no suggestion that Dr. Smith was aware of any problems with the provision of medical services by CorrectHealth personnel at Carroll County Jail. *Compare Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (finding supervisor liability appropriate where

23

the supervisor had received numerous complaints about inadequate staffing and failed to take action). Neither is there any evidence of any policy or procedure, implemented by Dr. Smith, that could have negatively affected Ms. Thompson's care.

In addition, like Sheriff Langley, Dr. Smith is entitled to qualified immunity. Although Dr. Smith is not a traditional state actor, while providing care to Ms. Thompson he was performing "a function that traditionally falls within the exclusive purview of a state entity." *Adams,* 61 F.3d at 1543 n.2 (citing *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir. 1985)). A qualified immunity analysis is therefore appropriate. *Id.* (applying qualified immunity analysis to jail doctors and nurses employed by private health services company).

Dr. Smith was acting within his discretionary authority in scheduling and interpreting a series of medical tests to diagnose Ms. Thompson's condition. *Id.* at 1545. Plaintiff has not presented any evidence that Dr. Smith's decisions were "plainly incompetent" or that he "knowingly violated" plaintiff's constitutional rights. *Vinyard,* 311 F.3d at 1346. As Dr. Smith is entitled to qualified immunity, and none of his actions rise to the level of a constitutional violation, his motion for summary judgment should be **GRANTED**.

24

AO 72A
(Rev.8/82)

4. P.A. Rose

Mr. Rose is a registered nurse with a physician's assistant certificate. (Rose Dep. [53] at 5-6.) He worked for CorrectHealth at the Carroll County Jail three days a week during the relevant time period. (*Id.* at 8.) Although Rose was more personally involved in Ms. Thompson's care, he is entitled to summary judgment for the same reasons as discussed above: none of his individual actions violated Ms. Thompson's constitutional rights and he is entitled to qualified immunity.

P.A. Rose saw Ms. Thompson initially on August 10th, when he performed a complete physical. Nothing in the physical suggested kidney problems. (Rose Dep. [53] at 20-21.) The next time P.A. Rose examined Ms. Thompson was on September 26th, following her complaint of blood in her urine and flank pain. (*Id.* at 18.) Based on her symptoms, Rose suspected that Ms. Thompson had a UTI or kidney stones. (*Id.* at 19-20.) He prescribed Ms. Thompson an antibiotic and a painkiller. (*Id.* at 20.) He also gave her a strainer to catch any stones that she might pass. (*Id.*)

Rose examined Ms. Thompson again on September 30th, when she complained of blood and blood clots in her urine. (*Id.* at 22-23.) He noted that a renal ultrasound had been performed the day before, admitted her into the infirmary for observation, and prescribed pain medication. (*Id.* at 23-24, 31.) He did an infirmary follow-

25

up October 3rd, during which he performed another physical exam, noted her pain level and condition, prescribed nausea medication, and planned to continue observing Ms. Thompson pending the ultrasound results. (*Id.* at 27-28.) When the ultrasound results were returned, Rose examined Ms. Thompson, took notes with regard to her condition, and referred her to Dr. Smith for further testing. (*Id.* at 28-31.) Rose discharged Ms. Thompson from the infirmary on October 5th. (*Id.* at 30, 32.)

Rose saw Ms. Thompson again on October 10th. During that visit, he noted her right and left flank pain and continued blood in the urine. (*Id.* at 34-36.) He also noted that she was waiting for a CT scan and that an ultrasound had been performed. (*Id.*) Upon physical examination, he noted that there was no mass in her abdomen, that she appeared alert, and that she was not in any acute distress. (Rose Dep. [53] at 37.) Rose wrote her another pain prescription and gave her medication for nausea. (*Id.*) On October 17th, when Ms. Thompson returned to the infirmary with pain, Rose readmitted her for better pain management. (*Id.* at 39.) He saw Ms. Thompson again on October 19th and noted that she was resting with no complaints and that the CT scan was scheduled for the next day. (*Id.*)

Dr. Oladele does not single out any of P.A. Rose's actions as improper, but he argues that more should have been done for Ms.

AO 72A
(Rev.8/82)

Thompson's pain and that the diagnostic process should have occurred faster. (Oladele Dep. [63] at 25-28.) Similar to plaintiff's claims against Dr. Smith, these are only challenges to Rose's decisions involving medical discretion and expertise, which cannot form the basis of a constitutional claim. *See Harris*, 941 F.2d at 1507 (explaining that a difference in medical opinion or mere negligence in treatment or diagnosis does not support a constitutional violation). Moreover, none of the acts listed above was such that Rose should have recognized that he was violating Ms. Thompson's rights or being deliberately indifferent to her needs. *See Adams*, 61 F.3d at 1543. As a result, P.A. Rose is entitled to qualified immunity. For these additional reasons, Rose's motion for summary judgment should be **GRANTED**.

### 5. CorrectHealth

Plaintiff's constitutional claims against CorrectHealth also fail because there is no evidence whatsoever to connect any act of CorrectHealth to the alleged constitutional violation. The policies implemented by CorrectHealth required a staff member to be at the medical center twenty-four hours a day, seven days a week. (Rose Dep. [53] at 9 and Oladele Dep. [63] at I00-01.) There is no evidence that any lower level provider had problems contacting or receiving a response from CorrectHealth supervisor Dr. Smith, and the record demonstrates significant notation and care with regard

27

to inmates' medical files and requests.

Neither has plaintiff produced any evidence that could subject CorrectHealth to supervisory liability. There is no evidence that CorrectHealth knew of a problem that it failed to remedy, especially a problem rising to the level of deliberate indifference. As the Court has explained, the main allegations and evidence merely suggest a minor difference in medical opinion, which does not suffice to establish liability.

Given the complete lack of any evidence to support liability against CorrectHealth, plaintiff essentially contends that there must have been a harmful policy, or some other failing, because Ms. Thompson did not receive proper care. However, one cannot assume the existence of a harmful policy simply because harm occurred. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540-41 (11th Cir. 1988)(holding that an unconstitutional policy could not be inferred from the "scintilla" of evidence presented by plaintiff). Accordingly, and for this additional reason, CorrectHealth's motion for summary judgment should be **GRANTED**.

## III.  **Plaintiff's State Law Claims**

When a federal court has dismissed all of the federal claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over any remaining state law claims. *See McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002)

28

(citing 28 U.S.C. § 1367(c)(3)). Indeed, the Supreme Court has directed lower federal courts to avoid, "needless decisions of state law," especially when federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Here, the Court has dismissed all of plaintiff's federal claims, and the remaining claims involve relatively complex decisions of state law. Accordingly, the Court **DISMISSES without prejudice** plaintiff's remaining state law claims.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant CorrectHealth's Motion for an Extension of Time to Respond [44], **GRANTS** plaintiff's Motion for an Extension of Time to Respond [52], **GRANTS** plaintiff's Motion to Amend the Complaint [42], **GRANTS** defendant CorrectHealth's Second Motion for Summary Judgment [47], **DENIES as moot** CorrectHealth's First Motion for Summary Judgment [29], and **GRANTS** Carroll County's Motion for Summary Judgment [48].

The **Clerk is directed to close** this action.

SO ORDERED, this ___24___ day of September, 2009.

_____
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)